UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION


IN RE: KIDS WORLD OF AMERICA, INC.    Case No. 04-35242
   Debtor            Chapter 11


_____


KIDS WORLD OF AMERICA, INC.,     Adv. Proc. No. 05-03217
   Plaintiff

vs.

STATE OF GEORGIA, DEPT. OF
EARLY CARE AND LEARNING
   Defendant.

---

MEMORANDUM OPINION COMBINED WITH
RELATED ORDERS AND NOTICE OF THE ENTRY THEREOF

---

   THESE CORE PROCEEDINGS under 28 U.S.C. 157(b)(2)(A) come before the Court on

Plaintiff Kids World of America, Inc.'s ("Plaintiff") Complaint for Turnover of Funds,

Defendant State of Georgia Department of Early Care and Learning's ("Defendant")[1] Answer,

Defendant's Motion to Dismiss and Plaintiff's Response to Motion to Dismiss.  The Court held a

consolidated evidentiary hearing on these matters on June 7, 2006.  At that time the Court took

---

[1] The State of Georgia, Department of Early Care and Learning runs Bright from the Start, a state agency which provides funding for child care and educational services to day care providers throughout Georgia.  Therefore, while the Georgia Department of Early Care and Learning is the Defendant, most of the actions and communications at issue in this case, were done by and involved its agency Bright from the Start.  Throughout the opinion, this Court refers to both the "Defendant" and "Bright from the Start."  While Bright from the Start is an agency under guidance and control of the Defendant, this Court felt it was best not to refer to the Defendant and Bright from the Start interchangeably so as not to cause confusion.

1

the Motion to Dismiss and Response to Motion to Dismiss under submission and took proof on the Complaint for Turnover of Funds. The Plaintiff was represented by counsel and offered the testimony of Jeffrey Owen, the principal of the Plaintiff; Ruth Coon, the Plaintiff's Area Manager for the State of Georgia; and Don Mitchell, an outside consultant for the Plaintiff. The Defendant was also represented by counsel and offered the testimony of Kay Hellwig, the Division Director for Childcare Services of Bright from the Start, Georgia Department of Early Care and Learning ("Bright from the Start"); Tanya R. Astin, Audit Coordinator of Bright from the Start; and Daphne Haley, Pre-Kindergarten Division Director of Bright from the Start.

At the consolidated evidentiary hearing, the Court informed the parties that it would be considering three distinct yet interrelated issues: (1) whether these are core proceedings; (2) whether the Defendant may successfully assert the defense of sovereign immunity in light of the Supreme Court's decision in *Central Virginia Community College v. Katz*, __U.S.__, 126 S.Ct. 990, 163 L.Ed. 2d 945 (2006); and (3) whether the Plaintiff can sustain a claim for turnover predicated under a quantum meruit theory of liability.[2] Based on the evidence presented, the statements of counsel, the testimony of the various witnesses, and the entire record in this case, this Court finds that these are core proceedings under 28 USC §157(b)(2)(A), that the Defendant cannot successfully assert the defense of sovereign immunity, and that the Plaintiff can sustain a limited claim for turnover based upon a quantum meruit theory of liability.

**Findings of Fact**

The Defendant is the Georgia state agency responsible for administering Bright from the

---

[2]The Court previously determined that the Plaintiff could not sustain a claim under a written contract theory. *See* Memorandum Opinion, dated May 9, 2006 (Doc. Entry 55).

Start.  Bright from the Start provides funding for child care and educational services to day care providers throughout Georgia.  In order to receive funding from the Bright from the Start, a child care provider must first submit an application to Bright from the Start, which evaluates the application, and then either accepts or denies the application.  Only after an application is accepted does the Defendant enter into a written contract for funding with the applicant. The Plaintiff is a child care provider with locations in Georgia that applied for and was granted a contract for a Bright from the Start Program for the fiscal years running from July 1, 2003 through June 30, 2004, and July 1, 2004 through June 30, 2005.[3]

Providers who have been granted contracts for previous years must resubmit an application to Bright from the Start for each year they wish to continue to receive funding through the Bright from the Start Program.  All applicants must submit their applications in February for the fiscal year commencing the coming July.  The contracts are paid on an installment basis, with the first of ten operating payments disbursed in August and payments made on a monthly basis thereafter.

Applicants who are currently offering classes under the auspices of Bright from the Start and wish to continue offering classes "may be pre-approved for the same number of classes at the same location(s) as the current year" if they are in "good standing."  Under the terms of the Bright from the Start application, programs in "good standing" are those that "have maintained full classes, met all program and reporting requirements, met child care licensing regulations, met federal nutrition program rules where applicable, have no unresolved audit or reconciliation

---

[3]The Plaintiff's predecessor, Children's Universe, had contracts with the Bright from the Start to provide Bright from the Start Programs.

issues and are not on probation." Providers who have been granted contracts for previous years but who also wish to add additional classes "must complete an expansion application by the due date but are still pre-approved for the same number of classes at the same location(s) as the current year." Expansion classes are not automatically pre-approved for providers who have previously held Bright from the Start contracts, and providers are advised not to assume a contract for expansion classes will be granted. It specifically states on the first page of the application under the heading Special Note: Funding for New and Expansion Classes, "[i]n past years, providers have operated partially or fully funded private classes in an effort to receive funding from the Department. Providers are strongly advised that operating private classes or funding classes at provider expense does not guarantee Department funding." Despite this language, the Plaintiff had previously undergone an audit for the 2002-2003 school year ("2003 Audit") and had run classes despite not having a contract in place. Upon completion of the audit, Bright from the Start retroactively funded the Plaintiff's 2003-2004 contract. Ms. Haley, Prekindergarten Division Director for Bright from the Start, also testified that if a Program Provider is subject to an audit that reconciles after the start of the fiscal year it is typically awarded a contract after the fiscal year has begun.

In early 2005, the Plaintiff applied to Bright from the Start for both a "continuation" contract and for funding for additional, or expansion, classes for the 2005-2006 school year. Prior to the 2005-2006 contract being entered, the Plaintiff received notice in a letter dated January 20, 2005 ("Audit Notice"), that it was subject to an audit for the 2003-2004 school year ("2005 Audit"). Due to the 2005 Audit, the Plaintiff was not in "good standing" and its continuation contract was not automatically approved. The Audit Notice stated that a

comprehensive programmatic and compliance review of the
Georgia Prekindergarten Program (Pre-K) will be conducted for
your center starting **2/2/05**, in accordance with <u>Section 3, Item C</u>
of your Prekindergarten contract.
Section 3, Item C of the Prekindrergarten contract states that centers
must permit Bright from the Start: Georgia Department of Early
Childcare Learning (DECAL)... 'or its authorized representatives,
to observe and evaluate the delivery or performance of contracted
services.'  (emphasis in the original).

The Audit Notice further set forth that

[t]he purpose of this review will be to examine records and
documentation to review compliance with the following:
1.)  All monies were used in accordance with contract guidelines.
2.)  All enrollment requirements were met.
3.)  Predindergarten classroom(s) met minimum requirements.
4.)  Children were not discriminated against and center was in
compliance with civil rights requirements.
5.)  Procedures for recordkeeping met minimum requirements.
Records are correct and comply with retention requirements.
Documentation was maintained for all expenditures for which
Georgia Prekindergarten Program funds were used.  Program
funds were disbursed as required.
6.)  Training for teachers and staff met minimum requirements.
7.)  There was a system in place to identify Prekindergarten
expenses.
8.)  The Resource Coordinator's contract was fully adhered to
(if applicable).

Although the Audit Notice claimed to set forth the purpose and scope of the 2005 Audit,

Ms. Haley, Prekindergarten Division Director with Bright from the Start, testified that the audit

was in fact precipitated by a letter from the Georgia Department of Revenue ("Georgia Revenue

Letter") that stated that the principal of the Plaintiff, Jeff Owen, was not paying his required

Georgia withholding taxes for three different corporations for which he was the principal.  The

Gerogia Revenue Letter further requested that Bright from the Start "cease and desist" doing

5

business with Kids World.  According to Ms. Haley, Bright from the Start "agreed to do an audit so that we would not just kick [Kids World] out."  The Audit Notice failed to mention anything about the Plaintiff's failure to pay taxes or inform the Plaintiff that the issue of state withholding taxes was the impetus of the 2005 Audit.  Further, it does not appear that Bright from the Start requested that its auditor, Cameron, Miles & Jackson PC ("Auditor"), examine if the Plaintiff had  paid its Georgia withholding taxes.

The 2005 Audit began in approximately February 2005 and continued through October 2005.  Throughout the audit process the Plaintiff was in contact with the Auditor and Bright from the Start regarding documentation and paper work that was required to complete the audit. Numerous emails were exchanged between Ms. Ruth Coon, a representative of the Plaintiff, and Ms. Haley.  Ms. Coon frequently requested assurances that the Plaintiff's contract with Bright from the Start would continue through the 2005-2006 school year and informed Ms. Haley that the Plaintiff was proceeding as if the contract would be renewed.

One such email is dated June 30, 2005, the last day of the 2004-2005 fiscal year.  In this email, Ms. Coon asked Ms. Haley if she had received certain audit information that she sent and asks if additional information needed to be forwarded.  In the email Ms. Coon also stated, "I know that the '06 contract can't be approved until we get the audit resolved, but I need to start hiring teachers and setting up classrooms.  Are you comfortable saying that our contract (with the additional class in Douglasville) will be renewed at the successful outcome of the audit?" Ms. Coon goes on to say that Kids World is in "desperate straights" financially because it is spending summer reserve money on payments owed to it by Bright from the Start.  In Ms. Haley's reply, which occurred less then an hour after she received the email, she asked for proof

6

that the withholding taxes were paid but did not address the question of whether the Plaintiff's contract would be renewed.

Ms. Coon again requested assurances regarding the 2005 contract in a second email, dated July 25, 2005. In this email, Ms. Coon informed Ms. Haley that she had "begun to set up my classrooms for the [2005-2006] school year...[and] would appreciate any help or guidance you can give me in resolving the outstanding issues, so that I can get my contract and begin the school year on time." Once again, Ms. Coon's concerns were not addressed.

The only communication from Bright from the Start to the Plaintiff specifically regarding the 2005-2006 contract was a letter dated July 25, 2005 ("July 25 Letter"). The July 25 Letter addressed to Ms. Coon from Tanya R. Astin, the Audit Coordinator, confirmed that audit information had been received and requested additional clarification regarding certain expenditures. The letter ended with the statement, "**[y]our contract will be held** and your organization may be ineligible to participate as a GA Pre-K program provider for fiscal year 2006." (emphasis in original). Both Ms. Coon and Jeff Owen testified that they interpreted this letter as stating that the contract was approved and would be released following completion of the audit. Specifically, Mr. Owen testified that "my understanding was that, if we satisfied the audit concerns, that we would have the funding fo the next 2005-2006 school year." No other communication was sent regarding whether the contract was or was not approved. Most notably, Bright from the Start did not send the Plaintiff the standard letter sent to applicants whose application for a contract has been denied.

The Plaintiff filed a Chapter 11 petition on August 17, 2005. Communication between the Plaintiff and Bright from the Start regarding the audit continued following the Chapter 11

filing.  Bright from the Start, however, did not receive notice that the Plaintiff filed for

bankruptcy until mid-October, 2005.

On September 30, 2005, Mr. Coon informed Ms. Haley by email that, "we think we will

have complied with all the conditions to receive our 2006 contract.  We are running our classes

in that expectation." The Plaintiff specifically told representatives of Bright from the Start that it

was proceeding as if a contract would retroactively be paid, as had happened with the 2003

Audit.  Bright from the Start did not attempt to dissuade the Plaintiff from running classes or

inform the Plaintiff that funding would not be forthcoming.

On October 18, 2005, the Auditor submitted to Bright from the Start a letter detailing the

findings of the 2005 Audit, which specifically found that the Plaintiff "has now supported that

they properly expended Pre-Kindgergarten funds.  There are no monies due to or due from

DECAL."  Despite the Auditor's finding that the Plaintiff's had passed its audit, Bright from the

Start informed the Plaintiff  that it still needed a compliance letter from the State of Georgia that

the Plaintiff had fully paid it taxes.  As noted previously, the Audit Notice did not state that the

reason for the audit was to determine if taxes had been paid, and it does not appear that the

Auditor addressed much less focused its inquiry on that issue. Ms. Haley testified that she was in

communication with the Plaintiff about obtaining a compliance letter from the Department of

Revenue regarding withholding taxes when she was informed that the Plaintiff had filed for

Chapter 11 bankruptcy relief.

The Plaintiff is presently before the Court seeking turnover of funds from the Defendant

for childcare and educational services that the Plaintiff provided to Bright from the Start for the

2005-2006 fiscal year.  The Plaintiff claims that, based on a quantum meruit theory of recovery,

Bright from the Start owes it a debt that is owed, matured, and payable on demand.  The Defendant counters that this is not a action for turnover because there is no debt, and sovereign immunity prevents the Plaintiff from raising a quantum meruit claim against it. Further, the Defendant argues that even if sovereign immunity does not provide an absolute defense, the Plaintiff could not sustain a claim based on a quantum meruit theory of recovery.

## Issues to be Determined

This case presents three interrelated but separate questions.  The ultimate question is whether the Defendant owes Plaintiff a debt based on a quantum meruit theory.  Before this Court can address that question, however, it must first determine if these matters are core proceedings under 28 U.S.C. §157(b)(3) and if  sovereign immunity provides the Defendant with a complete defense. If this Court determines that these are core proceedings and that sovereign immunity is not available to the Defendant, then the Court must determine if the Plaintiff has successfully established its claim against the Defendant based under quantum meruit.

## Conclusions of Law

The first issue that must be addressed is if these matters are core proceedings, and, thus, subject to this Court's authority to hear and determine such matters as contemplated under 28 U.S.C. §157(b)(1).[4]

Bankruptcy judges are granted authority to "hear and determine all cases under Title 11

---

[4]  This Court recognizes that this case provides a unique factual scenario that has not yet been addressed by the Sixth Circuit.  While this Court finds that these are core proceedings, if a reviewing court later determines that these are not core proceedings but merely related proceedings, this opinion may be treated as findings of fact and conclusions of law under 28 U.S.C. 157(c)(1) and procedurally dealt with pursuant to Fed.R.Bankr.P. 9033.

and all core proceedings under title 11" pursuant to 28 U.S.C. §157(b)(1).[5]  A core proceeding is one that "either invokes a substantive right created by federal bankruptcy law or one which could not exist outside of bankruptcy."  *In re Lowenbraun,* — F.3d — , 2006 WL 1836056 (6th Cir. 2006).  Section §157(b)(2)(A) of title 28 provides a non-exhaustive list of "core proceedings," and includes all "matters concerning the administration of the estate."  If a matter is merely "related to" a bankruptcy case but does not qualify as a "core proceeding," a bankruptcy court may hear the matter and submit proposed findings of fact and conclusions of law that are referred to the District Court for a de novo review; it is the District Court which then issues the final order or judgment.  28 U.S.C. §157(c)(1);  *Sanders Confectionery Products, Inc. v. Heller Financial, Inc.*, 973 F.2d 474, 483 (6th Cir. 1992); *In re Pioneer Inv. Services, Co.*, 946 F2d. 445, 449 (6th Cir. 1991).

The Sixth Circuit preformed a through analysis of the meaning and application of 28 U.S.C. §157 in  *In re Wolverine Radio Company,* 930 F.2d 1132, 1144-1145 (6th Cir. 1991). There, the Sixth Circuit began by analyzing the plain meaning of §157.  Under 28 U.S.C. §157(b)(1), a bankruptcy judge may hear and determine all "core proceedings arising *under* title 11, or arising *in* a case under title 11" *(emphasis added).*  A proceeding arises "under" title 11 if it involves a cause of action "created or determined by a statutory provision" of the bankruptcy code.  *Id.*, *internal citations omitted.*  A proceeding arises "in" a bankruptcy case if it could arise only in the context of a bankruptcy case.  *Id.*  Therefore, in determining if a matter is a core

---

[5]This Court also notes and finds of parenthetical interest that the Defendant did not request in its Answer or in a separate motion filed with this Court that this Court exercise either discretionary proceeding abstention under 28 U.S.C. §1334(c)(1) or mandatory proceeding abstention under 28 U.S.C. §1334(c)(2).

proceeding, the court must not only look to the form but also the substance of a particular matter. *Id.*

The Sixth Circuit in *Wolverine* found that the matter before it was initially termed as a motion to enforce the order of confirmation, which could not exist outside of a bankruptcy case. Additionally, the motion also invoked a substantive right created under §363 of the Bankruptcy Code. Although the matter was, as styled, grounded solely in bankruptcy law, the Sixth Circuit also found that the action could exist outside of bankruptcy as a claim under a state law cause of action. Despite the fact that a claim *could* exist outside of the bankruptcy context, the Sixth Circuit ultimately concluded that the action was core because it "involves issues which arose because of a bankruptcy proceeding...and because Wolverine asserts a right based on bankruptcy law." *Id.*

As noted in *Wolverine*, the possibility that an action could possibly be brought in a state court forum is not decisive as to whether an action is core or noncore. *Id.* at 1145. The wording of 28 U.S.C. §157(b)(3) clearly states that a determination by the bankruptcy judge as to whether a particular proceeding is core "shall not be made solely on the basis that its resolution may be affected by state law." Further, the Sixth Circuit has recognized instances where issues based in state law considerations are so "inextricably intertwined" with the bankruptcy proceeding that they are properly deemed "core proceedings" despite the fact that they may require consideration of state law. *See In re G.A.D., Inc.,* 340 F.3d 331, 336 (6th Cir. 2003*).*

As stated in Wolverine, a claim arises "in" the context of a bankruptcy case if it arises from the case itself. In looking at whether a claim arose "in" the bankruptcy case, the court must examine not only the nature of the claim but also its temporal relationship to the filing of

the petition. *Gentry v. Gentry,* 207 B.R. 146, 149 (E.D. Ky. 1997).  In the present case, this Court is presented with a unique factual situation in which the Plaintiff alleges that a contractual relationship entered into pre-petition with the Defendant was breached post-petition.  While no Sixth Circuit Court has directly addressed this particular factual issue, courts in other Circuits have grappled with similar factual situations.  For example, the Second Circuit in *In re Ben Cooper*, 896 F.2d 1394, 1398(1990), found that "the bankruptcy court has core jurisdiction, pursuant to 28 U.S.C. §157(b)(2)(A), over contract claims under state law when the contract was entered into post-petition."  The *In re Ben Cooper* Court reached this conclusion after performing an analysis of the congressional intent and legislative history of §157.  The Second Circuit there found that Congress, in enacting 28 U.S.C. §157(b)(2)(A), "intended that the phrase 'core proceedings' be interpreted broadly, close to or congruent with constitutional limits." *Id.* at 1398, *internal citations omitted.* The Second Circuit also noted the congressional sponsors of §157 "repeatedly said that 95 percent of the proceedings brought before bankruptcy judges were core proceedings." *Id.*, internal citations omitted.  Based on this broad legislative interpretation of the phrase "core proceeding," the Second Circuit found that the adjudication of post-petition contract claims, which by their very timing were inextricably linked with the bankruptcy estate, were essential to the administration of a bankruptcy estate and were, therefore, "core proceedings" subject to the jurisdiction of the bankruptcy court. *Id.* at 1399.  *See also Gentry v. Gentry,* 207 B.R. 146 (E.D. Ky. 1997)(finding that the Debtor's claim that a post petition sale of collateral was not commercially reasonable was a core proceeding because all relevant events arose post petition); *In re Arnold Print Works, Inc.,* 815 F.2d 165, 166 (1st Cir. 1987), (finding that "[t]he matter of timing and the relation to judicial administration of the bankrupt's estate

make a critical constitutional difference" in determining whether a proceeding is "core" or "non-core" for bankruptcy purposes); *Matter of Federated Dept. Sores, Inc.,* 144 B.R. 993 (Bankr. S.D. Ohio 1992), (finding that an insurance contract entered into post-petition was a core proceeding despite the fact that the parties may have had a prior relationship).

While the above cases provide guidance, this Court notes that *Ben Cooper* and cases that followed its holding dealt with contracts that were entered and breached post-petition. Therefore, this Court will also look to decisions of other courts that have examined instances, similar to the present factual scenario, where a contractual or quasi-contractual relationship was formed pre-petition, but the cause of action, *i.e.*, the breaching of that relationship, took place post-petition.  *In re Hughes-Bechtol, Inc.*, 132 B.R. 339 (S.D. Ohio 1991), *aff'd,* 144 B.R. 755 (S.D. Ohio 1992)[6], dealt with just such a situation.  In that case, the parties entered into a construction contract pre-petition.  Despite being entered pre-petition, the contract involved "significant and repeated postpetition transactions between the parties."  In fact, the Ohio Court noted that it "is undisputed in this proceeding that a majority of the work was performed postpetition, ninety-six percent (96%), while only 4% was performed prepetition."  *Id.* at 347-348.  Based on the particular factual circumstances of the case, the Ohio Court in *Hughes-Bechtol* found that the contract dispute was a core proceeding because the *cause of action* arose post-petition, despite the fact that the underlying contract on which that breach rested was

---

[6]In affirming the Bankruptcy Court, the District Court noted that cases "which have concluded that proceedings which allege causes of action for both prepetition and postpetition breaches of contracts are core proceedings, have involved significant and repeated postpetition transactions between a debtor, particularly a debtor-in-possession, and other parties pursuant to contracts which continued existing rights and obligations or established new rights and obligations among parties." 132 B.R. at 347.

formed pre-petition.  *See also, In re EWI, Inc.*, 1997 WL 811693, *3 (Bankr. N.D. Ohio 1997)(noting that "[a] significant number of courts have concluded that causes of action which arose post-petition are core because they arose 'in a case.'"); *In re Parke Imperial Conton, Ltd.*, 177 B.R. 544 (Bankr. N.D. Ohio 1994); *In re Hatchrite Corp.,* 211 B.R. 58, 61 (Bankr. E.D. Okla. 1997)(finding that claims arising post-petition are core proceedings affecting the administration of the estate); *Matter of Columbia Gas System, Inc.*, 164 B.R. 883, 885 (Bankr. D. Del. 1994)(finding a core proceeding in an action based upon "post-petition conduct relating to a pre-petition contract" where the "factual and legal issues are intertwined with reorganization issues.")

In the present case, the Plaintiff filed for bankruptcy relief on August 17, 2004.  At the time of the bankruptcy filing, the Plaintiff did not have a formal contract with Bright from the Start but was continuing to provide pre-k services in anticipation of a contract being retroactively issued and paid, a practice for which there was precedent.  While this Court will address whether this case presents a valid quantum meruit claim, *infra*, it is sufficient to note here that the underlying actions of the Plaintiff and Bright from the Start that precipitated this action occurred post-petition.

The fiscal year for Bright From the Start Programs runs from July 1-June 31; however, the educational component does not typically commence until late August or early September. The Plaintiff began to inquire in late June if its contract was going to be renewed for the 2005-2006 fiscal year.  Bright from the Start ignored the Plaintiff's question.  Both Ms. Coon and Mr. Owen testified that they had been led to believe that if the audit was successfully completed their contract would be renewed.  While there is no clear evidence to support this assumption, there is

evidence of repeated requests by Ms. Coon as to the state of the contract, which were repeatedly ignored, and past-dealings with Bright from the Start in which a contract was retroactively paid following the completion of a successful audit.   It is undoubtedly clear that the parties were in contact post-petition, that the Plaintiff was proceeding as if a contract was in place, and that the Bright from the Start knew that the Plaintiff was preforming work in anticipation of such a contract.  On September 30, 2005, Plaintiff's representative, Ms. Coon, informed Ms. Haley that, "we think we will have complied with all the conditions to receive our 2006 contract.  We are running our classes in that expectation." Ms. Haley responded, "[w]e will still need a letter from both IRS and State Revenue showing that you are in compliance with all employee withholding taxes if you are to receive a Pre-K contract."  Ms. Haley did not tell the Plaintiff to stop running classes or that there was not funding available for its contract.  Instead, Ms. Haley essentially stated that a contract was forthcoming if the Plaintiff could provide clearance from the various taxing authorities.

The repeated contact on both sides, coupled with the knowledge that the Plaintiff was running pre-k programs in anticipation of being funded, leads to the conclusion that Bright from the Start knew the Plaintiff was providing a service which it thought would be reimbursed by Bright from the Start.  It is also clear that the vast majority of this communication, as well as the pre-k services themselves, were performed post-petition.  Because the substance of the action arose post-petition, this Court finds that this cause of action arose "in" a bankruptcy case.

Despite the fact that it is apparent that this cause of action arose "in" the bankruptcy case, the Defendant argues that the "form" of the action is actually a state law claim and, therefore, does not arise under the Bankruptcy Code.  Upon careful examination, however, this Court finds

15

that this is not a state law claim wrapped in the clothing of a bankruptcy action, but an action that arises under the language of the Bankruptcy Code itself.

This Court determined by previous Order that a valid written contract did not exist, but held that there remained a question as to whether the Plaintiff could maintain a turnover action based upon a quantum meruit theory.  While the Plaintiff argues that this is a proper action for turnover, the Defendant counters that this is not a turnover action but is in fact a state law claim for breach of contract.  Upon careful consideration of the facts, this Court finds that this is an action in the nature of turnover, a cause of action somewhat unique to bankruptcy.

11 U.S.C. §542(b), entitled "Turnover of Property of the Estate," states:

> Except as provided by subsection (c) or (d) of this section, an entity that owes a debt that is property of the estate and that is matured, payable on demand or payable on order, shall pay such debt to, or on the order of, the trustee except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor.

A debt is "matured," "payable on demand," or "payable on order" if it is presently payable, but does not apply to debts that are only payable upon the occurrence of some later event. *In re Gordon Transport,* 51 B.R. 633 (Bankr. W.D. Tenn. 1985).  The fact that a defendant may deny the existence of a debt is irrelevant as "long as...allegations state the existence of a mature debt."  *In re Cambridge Capital, LLC.,* 331 B.R. 47 (Bankr. E.D. N.Y., 2005), *internal citations omitted.*; *see also In re Rawson,* 40 B.R. 167, 169 (Bankr. Ohio 1984)(the "mere fact that the defendants deny these allegations does not take the trustee's action outside the scope of section 542(b)").  A dispute as to the existence of a debt is a question that can be decided during the course of a turnover proceeding.  *Gordon Transport,* 51 B.R. at 663.

In the present case, the Plaintiff alleges that it provided services to Bright from the Start,

which Bright from the Start was aware of, and for which the Plaintiff expected to receive compensation.  The Defendant disputes the existence of the debt.  The Defendant's denial that the debt exists does not make the debt "unmatured" and/or not "payable on demand."  As discussed in *Gordon Transport*, the existence of a debt is a distinct inquiry from whether a debt is matured.  If a court determines that if a debt would be matured and payable on demand, it is a turnover action despite the fact that the parties dispute whether the debt exists. To hold otherwise would mean that a defendant could defeat all turnover claims by merely denying that money was owed.  Taking into consideration the Plaintiff's allegations coupled with the evidence presented, the Defendant's mere denial of the debt is insufficient to prevent the turnover action from proceeding in this Court.

As stated, all that is required to bring a turnover claim is that, if a debt does in fact exist, it is matured and payable on demand.  The Bright from the Start Program was funded through ten operating payments, the first of which commenced August 12, 2005.  The Plaintiff provided the services and expected monthly payments in return for those services.  There is no future event or act that it needed to make this money due and owing; the Plaintiff has provided its consideration.  This case, therefore, presents a valid claim for turnover as contemplated under 11 U.S.C. §542.  It is proper for a bankruptcy court under these unique circumstances to determine the existence of the claim itself.  *Gordon Transport,* 51 B.R. at 663.  Whether money, in fact, should be turned over by the Defendant to the Plaintiff will be determined, *infra*, after this Court determines if a claim for quantum meruit exists.

Taking the Sixth Circuit precedent established in *Wolverine,* combined with decisions from both the Sixth Circuit and sister Circuits dealing with similar factual situations, this Court

17

finds under these unique circumstances that the post-petition actions of Bright from the Start in this situation make the claim brought by the Plaintiff via this adversary proceeding a cause of action that arose *in* a bankruptcy case, and *under* the Bankruptcy Code. 28 U.S.C. §1334(b). Similar to the Sixth Circuit in *Wolverine,* this Court acknowledges that this action could conceivably have been brought outside of bankruptcy as a state law breach of contract claim or a quasi contract claim if the Plaintiff had not been in bankruptcy (i.e., that exclusive but not exclusive jurisdiction by virtue of 28 U.S.C. §1334(b) exists). The guidance provided by *Wolverine* also shows this Court, however, that the mere fact that an action *could* have been raised outside the bankruptcy context, by virtue of the concurrent jurisdiction under 28 U.S.C. §1334(b), does not ipso facto lead to the conclusion that this is a noncore proceeding. Based upon the fact that this cause of action arose *in* a bankruptcy case, and *under* the Bankruptcy Code, 11 U.S.C. § 542, the Court finds that this is a core proceeding.

Having determined that this is a core proceeding, this Court must now look to see if the Defendant may successfully claim sovereign immunity as an absolute defense in light of the Supreme Court's recent decision in *Central Virginia Community College v. Katz*, __U.S.__, 126 S.Ct. 990, 163 L.Ed. 2d 945 (2006).

The Eleventh Amendment states:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State or by Citizens or Subjects of any Foreign State.

The Eleventh Amendment did not introduce a new concept into American jurisprudence but only reaffirmed the presupposition that "each state is a sovereign entity in our federal system; and...that '[i]t is inherent in the nature of sovereignty not to be amenable to the suit of an

individual without its consent." *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 54, 116 S.Ct. 1114 (1996), *citing Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). Congress can only abrogate sovereign immunity through an unequivocal expression of its intent to do so, and, if in doing so, it is acting pursuant to a valid exercise of power. *Id.* at 55.

Although the Supreme Court has found very few instances where state sovereign immunity has been properly abrogated, bankruptcy has been found to be one such area. In *Central Virginia Community College v. Katz*, __ U.S.__, 126 S.Ct. 990, 163 L.Ed. 2d 945 (2006), the Supreme Court held that "[t]he history of the Bankruptcy Clause, the reasons it was inserted in the Constitution, and the legislation both proposed and enacted under its auspices immediately following ratification of the Constitution demonstrate that it was intended not just as a grant of legislative authority to Congress, but also to authorize limited subordination of state sovereign immunity in the bankruptcy arena." *Id.* at 996. In a thorough and detailed historical analysis, the Court found that bankruptcy is unique in that the Framers of the Constitution recognized that disparate laws on bankruptcy resulted in "wildly divergent schemes for discharging debtors and their debt." *Id.* at 997. The Court found that "the Framers, in adopting the Bankruptcy Clause, plainly intended to give Congress the power to redress the rampant injustice resulting from States' refusal to respect one another's discharge orders...the power to enact bankruptcy legislation was understood to carry with it the power to subordinate state sovereignty, albeit within a limited sphere." *Id.* at 1004.

These "uncoordinated actions of multiple sovereigns" pushed the Framers of the Constitution to include in the text of Article I, §8, cl. 4, that Congress shall have to the power to establish "uniform Laws on the subject of Bankruptcies throughout the United States." *Id.* at

19

999.  In order for the "uniform laws" to have effect, the "States agreed in the plan of the convention not to assert any sovereign immunity defense they might have had in proceedings brought pursuant to 'Laws on the subject of Bankruptcies.'"  *Id.* at 1004-1005.   In so agreeing, "the States acquiesced in a subordination of whatever sovereign immunity they might otherwise have asserted in proceedings necessary to effectuate the *in rem* jurisdiction of the bankruptcy courts."  *Id.* at 1004.  The Court concludes that it is "beyond preadventure" that the States are subject to proceedings that properly lie within the scope of Congress' power to enact "Laws on the subject of Bankruptcies."  *Id.* at 1005.

In *Katz,* the Court found that the State of Virginia could not avoid the reach of the bankruptcy court's avoidance and turnover powers by claiming sovereign immunity.  To allow the State to do so would ignore the Congressional intent to subject the states to uniform "laws on the subject of Bankruptcies."  Similarly, the State of Georgia here is trying to argue that it is not subject to this Court's jurisdiction in the present matter.  The Defendant's argument is grounded on the basis that this is essentially a breach of contract action.  As determined, *supra*, this is more properly considered as being in the nature of an action for turnover.  As the Supreme Court found in *Katz* when it was similarly faced with an action for turnover, this is unquestionably an action arising under one of the "laws on the subject of Bankruptcies" for which the framers of the Constitution did not intend sovereign immunity to extend.  Therefore, the Defendant is subject to this Court's jurisdiction and cannot, in light of *Katz,* successfully assert sovereign immunity.

As this Court has resolved that these are core proceedings, and that the Defendant cannot successfully assert sovereign immunity as a defense, it  may now turn to the actual merits of the

20

Plaintiff's Complaint for Turnover.

The standard for turnover under 11 U.S.C. §542 is set forth above.   As stated, the key inquiry in a turnover action ordinarily is if there is an amount of money that is "due," "owing" and "payable on demand."   The payments currently at issue were made on an installment basis, with the pre-k provider receiving monthly payments beginning in August of 2006.  The amount due, therefore, which is owing or "payable on demand" is determinable by multiplying the monthly payments by the number of months that services were provided.  The Defendant argues, however, that there was no contractual relationship and therefore no debt.  As the Court in *In re Gordon Transports* found, a dispute as to the existence of a debt may be resolved during the course of a turnover proceeding.  51 B.R. at 663, *citing In re Fulghum Construction Corp.*, 23 B.R. 147 (Bankr. MD Tenn. 1982).  The only essential requirement of a turnover proceeding is that if a debt does exist, it is currently "due," "matured" and "payable on demand."  In other words, the party seeking turnover must have fulfilled its obligation to collect such a debt.  The existence of a debt itself may properly be determined through the turnover action.  *Id.*  Finding that the only issue at this point is the existence of the debt itself, we turn to the Plaintiff's allegations that the debt exists under a theory of quantum meruit.

The essential elements of a quantum meruit claim are "(1) the provider performed as agent services valuable to the recipient; (2) either at the request of the recipient or knowingly accepted by the recipient; (3) the recipient's receipt of which without compensating the provider would be unjust; and (4) provider's expectation of compensation at the time of rendition of services."  *Hollifield v. Monte Vista Biblical Gardens, Inc.,* 251 Ga. App. 124, 128-129 (Ga. App. 2001).  Quantum meruit is not applicable to volunteer situations where services are

rendered with no expectation of compensation in return.  *Id.*  When valuable services are provided and accepted, it is implied that a reasonable compensation will be paid.  *Id.*  The legal presumption of compensation for services is rebuttable by showing proof that either (1) the services were gratuitously rendered, or (2) that under the particular circumstances, the services were not meant to be compensated.  *Id.*

Applying this standard to the present case, it is clear that the Plaintiff can sustain a claim under quantum meruit.  To begin, the Plaintiff provided valuable services to Bright from the Start by providing childcare and educational services to children in the State of Georgia. The Defendant claims that any services provided were beneficial to the children and their parents only, and such benefit does not extend to the State.  This argument is somewhat disingenuous. In the 2004-2005 school year contract between the parties, the "purpose" of the contract is stated as "to coordinate and provide services for four-year old children and their families served by Georgia's Pre-K Program."  The Plaintiff preformed this service, and the Defendant received the benefit of "services" provided to Georgia's four year old children.   The purpose of Bright from the Start is to provide funding to day care and educational service providers in Georgia.  The Defendant therefore is a beneficiary of valuable services that were so provided by the Plaintiff. To disclaim that it received benefits from the services of day care and educational providers is simply not accurate.

The next question is whether Bright from the Start either requested or knowingly accepted the services provided.  It is clear that Bright from the Start knew Plaintiff was providing pre-k services to Georgia children for which the Plaintiff thought would it be reimbursed.  The Plaintiff informed Bright from the Start on numerous occasions that it was running pre-k classes and

22

expected that Bright from the Start would reimburse it for the classes provided.  Further, Bright from the Start never told the Plaintiff that its contract was not being renewed despite direct inquiries from the Plaintiff.  Additionally, the parties had a past pattern or course of dealings.  In 2004, Bright from the Start retroactively paid the Plaintiff's contract following the successful completion of an audit.  Thus, Bright from the Start knowingly accepted the Plaintiff's services.

This Court must next determine if it would be unjust or inequitable under the circumstances for Bright from the Start to receive such services from the Plaintiff without remitting reasonable compensation.  This Court finds that the Defendant's failure to reimburse the Plaintiff for services is unjust under the totality of the circumstances.  As stated above, the Defendant knowingly received a valuable benefit rendered by the Plaintiff.  The Plaintiff expended a great deal of money and effort in providing theses important services. These services were valuable and provided a direct benefit to the children of Georgia which, therefore, benefitted the Defendant as well as the children.  To allow the Defendant under these circumstances to receive such a benefit without having to reasonably compensate for these services would be unjust to the Plaintiff's creditors and an inequitable windfall to the Defendant.

Finally, this Court must determine if the Plaintiff anticipated compensation at the time that it provided the services, or if it provided these services on a volunteer basis.  It is undoubtedly clear that the Plaintiff anticipated compensation during at least part of the time period in question.  The Plaintiff told Bright from the Start on more than one occasion that it was "setting up its classrooms" in anticipation of beginning classes and that it was "running their classes" in expectation of having its contract renewed.  Moreover, the Plaintiff told Bright from the Start that it was in financial difficulty and was anticipating funds through the Bright from the

Start program.  Bright from the Start knew the Plaintiff was running pre-k classes with the expectation that it would be reimbursed by Bright from the Start.

The Defendant has provided no evidence either that the services were gratuitously rendered, or that under the particular circumstances, the services were not meant to be compensated.  As such, the Defendant has failed to rebut the basic legal presumption that when valuable services are knowingly accepted, reasonable compensation will be paid. *Hollifield,* 251 Ga. App. at 129.

Despite finding that the Plaintiff has met its burden of proof under a theory of quantum meruit, the Court cannot conclude that Plaintiff reasonably should have expected compensation for the entire time period in which it provided services to the Defendant.  This Court also finds that the Plaintiff's expectation of compensation under these circumstances should have ceased on January 18, 2006, the day the Defendant filed an Answer in the present matter denying a debt was owed to the Plaintiff.  On December 19, 2005, the Plaintiff filed a Complaint for turnover of funds.  On January 18, 2006, the Plaintiff filed its Answer to the Complaint and denied any liability to the Plaintiff. At this point in time, the Plaintiff realized or should have realized that its expectation of compensation was in serious doubt. The Plaintiff should have at that time ceased providing services. Any services it provided thereafter were provided at the Plaintiff's own risk. Therefore, this Court finds that the Plaintiff is entitled to compensation for the services it provided only until the Defendant filed its answer on January 18, 2006.  As stated earlier, Bright from the Start provided funding to pre-k providers on an ongoing basis, in the form of 10 payments.  Therefore, the Plaintiff is entitled to receive the amount of compensation it would have received as of January 18, 2006, for the services provided.

24

IT IS HEREBY ORDERED ADJUDGED AND DECREED AND NOTICE IS HEREBY GIVEN that the Plaintiff's Complaint for Turnover is GRANTED in part and DENIED in part consistent with the foregoing.  The Plaintiff shall have thirty days from the date of the entry of this Order to submit a Proposed Judgment for the amount that was due an owing to the Plaintiff by the Defendant as of January 18, 2006.  The Defendant will then have 20 thereafter days to respond to the Plaintiff's Proposed Judgment setting forth its objection, if any, to the amount as stated in the Plaintiff's Proposed Judgement.  If the Defendant does not file a timely response disputing the amount asserted by the Plaintiff, this Court will adopt the Plaintiff's Proposed Judgment.  If the Defendant does file a response disputing the amount asserted by the Plaintiff, the Court will schedule a proceeding status conference pursuant to 11 U.S.C. §105(d)(1) to determine if a further evidentiary hearing is required in order to fix the appropriate amount of the Judgment.

A separate Order consistent with the foregoing has been entered in accordance with the Federal Rules of Bankruptcy Procedure 9021.